## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| | : | |
| **v.** | : | **Case No. 23-CR-00285 (JMC)** |
| | : | |
| **HAROLD JOHNSON,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits its memorandum in aid of sentencing.   For the reasons herein, the United States requests that the Court sentence the defendant to a period of **151 months** of incarceration; the government further requests that the Court impose a period of 4 years of supervised release and enter the Consent Order of Forfeiture signed by the parties.   In support of this sentence, the government states the following:

### I.        FACTUAL AND PROCEDURAL BACKGROUND

Defendant Harold Johnson is charged by indictment with seven counts of Distribution of Phencyclidine, one count of Distribution of Fentanyl and three counts of Possession With Intent to Distribute in violation of Title 21 U.S.C. §§ 841(a)(1), (b)(1) and (b)(1)(C).   This case arises from an investigation by the Metropolitan Police Department (MPD), and Federal Bureau of Investigation (FBI) into the distribution of phencyclidine and fentanyl by the defendant in the Washington, D.C. metropolitan area.

**Undercover Purchase (5 ounces PCP total)**

On Tuesday, September 6, 2022, members of VCIT conducted a controlled purchase with Undercover 2360 in the 2600 block of 14th Street, Northwest in Washington, D.C. Undercover 2360 was provided pre-recorded MPD funds to purchase illegal narcotics. Undercover 2360 entered the parking lot of the Crown Gas Station and contacted **Harold Johnson** via his cell phone 202-415-6794. Undercover 2360 and **Johnson** then met on the sidewalk in the 2600 block of 14th Street and began walking northbound. **(Figure 1).** Undercover 2360 then handed $1,250.00 dollars of pre- recorded funds to **Johnson**. In exchange, **Johnson** gave Undercover 2360 one large four-ounce bottle containing an amber color liquid substance and a one ounce bottle containing an amber color substance. Both bottles had a strong chemical odor protruding from the bottles which were consistent with Phencyclidine (PCP). The two bottles were photographed and placed on the Violent Crime Suppression Division (VCSD) property book. A subsequent laboratory analysis confirmed that the substance was in fact PCP.



**Figure 1**

During this operation **Johnson** talked to Undercover 2360 regarding the sale of firearms. He specifically referenced one pistol with a 30-round magazine for $700.00 dollars and one rifle with a 30 round magazine for $800.00 dollars. **Johnson** stated to Undercover 2360 that he would text a photo to Undercover 2360 of the firearms, but this never came to fruition.

### Undercover Purchase (6 ounces PCP total)

On October 13, 2022, members of VCIT conducted a controlled purchase with Undercover 2360 in the 2600 block of 14th Street, Northwest, Washington, D.C. Undercover 2360 was provided pre-recorded MPD funds to purchase PCP. Undercover 2360 entered the parking lot of the Crown Gas Station and contacted **Johnson** via his cell phone 202-415-6794. **Johnson** arrived at the parking lot in a white Lexus bearing Maryland tags T0948977 and Undercover 2360 walked up to the passenger side of **Johnson**'s vehicle. Undercover 2360 then gave $1500.00 dollars of pre-recorded funds to **Johnson** in exchange for one large plastic bottle containing six ounces of reddish colored liquid substance. The bottle had a strong chemical odor protruding from the bottle which was consistent to PCP. The bottle was photographed and placed on VCSD property book. A subsequent laboratory analysis confirmed that the substance was in fact PCP.

### Undercover Purchase (8 ounces PCP total)

On Thursday, October 27th, 2022, members of VCIT conducted a controlled purchase with Undercover 2360 in the 2600 block of 14th Street, Northwest, Washington D.C. Undercover 2360 was provided pre-recorded MPD funds to purchase PCP. Undercover 2360 entered the parking lot of the Crown Gas Station and contacted **Johnson** via cell phone 202-415- 6794. Undercover 2360 saw that **Johnson** was in a white Lexus bearing Maryland temp tags T09489977. Undercover 2360 walked up to the passenger side of the vehicle and handed $2,000 dollars of pre-

3

recorded funds to **Johnson**.   In exchange **Johnson** gave Undercover 2360 one large eight-ounce bottle containing an amber color liquid substance. The bottle had a strong chemical odor protruding from within which was consistent to PCP.   The bottle was photographed and placed on VCSD property book.   A subsequent laboratory analysis confirmed that the substance was in fact PCP.

**Undercover Purchase (8 ounces PCP total)**

On December 6, 2022, members of VCIT Investigations, as well as the FBI, briefed Undercover 2360 and another undercover MPD officer ("Undercover 1912") (collectively the "Undercovers") for a PCP purchase at 2600 14th Street N.W. in Washington D.C.   The undercover MPD officers had obtained **Johnson**'s number through the confidential informant and the transaction had been arranged via text message.

The arranged purchase was for eight ounces of PCP at 11:02 a.m. and the Undercovers contacted **Johnson** letting him know they were close.   The Undercovers arrived at a gas station at 11:06 a.m. and waited for **Johnson**.   At 11:10 a.m. a white Lexus sedan arrived in the 1400 block of Euclid Street, N.W. and parked facing westbound in front of Detective Cuevas and Investigator Tariq.   The tag affixed to the vehicle was a Maryland temp tag T1104136.

The Undercovers approached and made contact with **Johnson**. Undercover 2360 introduced Undercover 1912 as a family member and Undercover 1912 gave **Johnson** $2,000 of pre-recorded MPD funds.   **Johnson** retrieved a bright green and white bag from the passenger side floor board and gave it to Undercover 1912.   Inside of this bag was an empty bag of potato chips containing one four ounce vial and four one ounce vials all full of an amber fluid which emanated a strong chemical odor associated with PCP.   **(Figure 2).**   Undercover 2360 conversed briefly with **Johnson** and then walked back to the Undercovers' vehicle with Undercover 1912.

4



**Figure 2**

The purchased PCP is consistent in color and odor with PCP.   Special Agent David **Johnson** recovered the drugs and transported them into FBI custody.   A laboratory analysis confirmed that the substance was in fact PCP.

### Undercover Purchase (8 ounces PCP total)

On December 20, 2022, members of VCIT as well as the FBI, briefed Undercover 1912 for a PCP purchase at 2600 14th Street, N.W.   Undercover 1912 had been in communication with **Johnson** and had arranged the transaction by texting **Johnson** at 202-415-6794.

The arranged purchase was for eight ounces of PCP and the VCIT Investigations team received assignments to take positions at a gas station located at 2600 14th Street N.W.   The team made their way to the location and set up multiple observation posts.     Investigator Tariq conducted external video recording while Undercover 1912 was equipped with a covert audio/video recording device and utilized a cell phone which also captured audio and video.

5

At 10:08 a.m, Undercover 1912 contacted **Johnson** letting him know he was arriving. **Johnson** arrived in the 1400 block of Euclid Street N.W. and was driving a dark gray Mercedes Benz sedan bearing DC tags VZA-128. The vehicle had a red/white candy cane ornament on the grill of the vehicle. Undercover 1912 walked to the vehicle and made contact with **Johnson**. Undercover 1912 gave **Johnson** $2,000 of FBI funds and in exchange **Johnson** handed him a green plastic bag with white writing on it.   Inside of the bag was a "Mott's" apple juice container which was full of an amber fluid, which emanated a strong chemical odor consistent with that of Phencyclidine. With the "Mott's" bottle were eight empty individual clear one ounce vials. **(Figure 3).**



**Figure 3**

**Johnson** was last seen driving south on 14th, west on Clifton and then north on University. A subsequent laboratory analysis confirmed that the substance was in fact PCP.

### Undercover Purchase (8 ounces PCP total)

On February 1, 2023, members of VCIT and FBI briefed Undercover 1912 for a PCP purchase in the vicinity of 2600 14th Street N.W. in Washington D.C.  FBI Special Agents observed **Johnson** leave his residence at 5949 Fisher Road, Temple Hills, MD and enter the driver's seat of the white Lexus Sedan before departing the area for Washington, D.C. Undercover 1912 made contact with **Johnson** via telephone number 202-415-6794 to initiate the buy.

The arranged purchase was for eight ounces of PCP that would be conducted and surveilled by members of the VCIT Investigations and FBI.  VCIT Investigators observed the white Lexus sedan enter the buy location.   **Johnson** was observed exiting and entering the white Lexus sedan at the gas station located at 2600 14th Street, Washington, DC by members of VCIT Investigations prior to the buy.   The buy was recorded through external video recordings conducted by surveillance members as well as covert audio/video recordings devices on Undercover 1912.

At 11:20 a.m. Undercover 1912 made contact with **Johnson** near the intersection of Euclid Street Northwest and 14th Street Northwest, Washington, D.C.   **Johnson** was in the white Lexus sedan.  Undercover 1912 gave **Johnson** $2,000 of FBI funds and in exchange **Johnson** handed him a green plastic bag with white writing on it. Inside of the bag was a "Mott's" apple juice container which was full of an amber fluid which emanated a strong chemical odor consistent

with that of Phencyclidine. With the "Mott's" bottle were eight empty individual clear one ounce vials.

During this buy, **Johnson** was asked if he could provide Undercover 1912 with "Fent." To which **Johnson** replied in the affirmative and that he could supply Undercover 1912 as early as tomorrow, February 2, 2023.   Following the buy, the white Lexus sedan departed from the area with surveillance being conducted by FBI.

Additionally at this buy, **Johnson** told Undercover 1912 that he sold the Mercedes Benz sedan bearing DC tags VZA-128, that he drove at the last PCP buy on December 20, 2022. **Johnson** told Undercover 1912 that he sells cars and any car he drives is for sale.

Undercover 1912 met with members of the FBI to turn over the bag provided by **Johnson**.   The bag, containing the Mott's Apple Juice bottle filled with approximately 8 ounces of suspected PCP and empty glass vials that were taken back to the FBI Washington Field Office to be placed into evidence.   **(Figure 4).**   The suspected PCP was field tested and was positive for PCP.    A subsequent laboratory analysis confirmed that the substance was in fact PCP.



**Figure 4**

**Undercover Purchase (8 ounces PCP and .5 ounce Fentanyl)**

On February 22, 2023, members of VCIT, FBI and DEA briefed Undercover 1912 for a PCP and Fentanyl purchase in the vicinity of 2600 14th Street N.W. in Washington, D.C. FBI Special Agents observed **Johnson** leave his residence at 5949 Fisher Road, Temple Hills, MD and enter the driver's seat of the white Lexus LS460, now bearing Washington, D.C. license plate VZA286.   Undercover 1912 made contact with **Johnson** via telephone number 202-415-6794 to initiate the buy.

The arranged purchase was for eight ounces of PCP and a half ounce of fentanyl that would be conducted and surveilled by members of VCIT, FBI, and DEA.   VCIT Investigators observed the white Lexus enter the buy location.   The Lexus parked on 14th Street Northwest at

9

the corner of Euclid Street Northwest, Washington, DC.   **Johnson** was in the white Lexus sedan. Undercover 1912 gave **Johnson** $2,800 of FBI funds and in exchange **Johnson** gave UC 1912 a green plastic bag with white writing on it.   Inside of the bag was a "Mott's" apple juice container which was full of an amber fluid which emanated a strong chemical odor consistent with that of Phencyclidine and a clear plastic bag containing a whitish-grey powdery substance, suspected to be fentanyl.

Undercover 1912 met with members of the FBI to turn over the bag provided by **Johnson**.   The bag, containing the Mott's Apple Juice bottle filled with approximately 8 ounces of suspected PCP and clear plastic bag containing a whitish-grey powdery substance, suspected to be fentanyl, were taken back to VCIT for field testing.   The suspected fentanyl was field tested using the MX 908 and was positive for fentanyl and xylazine.   The bag containing the suspected PCP and fentanyl was taken back to the FBI Washington Field Office to be placed into evidence. **(Figure 5).**   A subsequent lab analysis confirmed that the substance was in fact PCP.



**Figure 5**

**<u>March 20, 2023 – Arrest of Harold Johnson</u>**

On March 20, 2023, **Johnson** was arrested by the United States Park Police (USPP) on drug possession and distribution charges. The search incident to arrest yielded the seizure of approximately a one-ounce glass vial of suspected liquid PCP, 25 small baggies of suspected fentanyl (9.6 grams), 40 small baggies of suspected cocaine base (9.2 grams), 7 hand-rolled cigarettes with green plant material, 4 packages of marijuana, 1 pack of Newport cigarettes, and $100.00 in U.S. currency. The aroma that emitted from the vial, which contained an amber-colored liquid, was consistent with the smell of liquid PCP. Drugs and cash recovered from **Johnson** is consistent with possession with intent to distribute rather than mere possession. This case was "no papered" by the U.S. Attorney's Office for the District of Columbia on March 21, 2023.

On August 25, 2023, agents arrested Johnson for the above-mentioned offenses. Upon his arrest, federal and state law enforcement executed a search warrant at his residence where they seized $4,840, three bottles of an unknown liquid and two illegal firearms. One firearm was a black and silver Sig Saur P365 with 9 mm ammunition with one round in the chamber and the second a black multicolor Taurus 9mm handgun that was found under a mattress in a bedroom **(Figure 6 & 7).**



| | |
|:---:|:---:|
| **Figure 6** | **Figure 7** |

In total, the defendant sold phencyclidine to undercover officers on seven separate occasions that totaled 51 ounces of phencyclidine and approximately 15.1 grams of fentanyl on one occasion. The defendant can be identified by undercover officers **(Figure 8)** and is clearly seen on surveillance footage on October 27, 2022 and September 6, 2022. **(Figure 9 & 10).**





Do you know this person?

Yes

What is his name?

Harold Johnson

How do you know this person?

Under Cover buys



***Figure 8***



**Figure 9**



**Figure 10**

Finally, two illegal firearms and two white rocks **(Figure 11)** that field tested positive for cocaine at the defendant's residence were recovered at the time of his arrest.   Three vials of an unknown liquid were also recovered.



**Figure 11**

## II.    DISCUSSION AND RECOMMENDATION

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in Title 18, United States Code, Section 3553(a).    *See United States v. Gall*, 128 S. Ct. 586, 596 (2007).    Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *United States v. Rita*, 127 S. Ct. 2456, 2463-65 (2007).    The Section 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the purposes of the statute; (3) the kinds of sentences available; (4) the sentencing guidelines; (5) policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to any victims.

1.  Statutory Penalties and the U.S. Sentencing Guidelines

A violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(B)(iv) carries a mandatory minimum sentence of 5 years of imprisonment and a maximum sentence of 40 years of imprisonment; a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18 of the United States Code   or $10,000,000;   a term of supervised release of not less than 4 years and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

A.  Offense Level Calculation

In the plea agreement, the parties agreed that the base offense level is governed by U.S.S.G. § 1B1.3.   In this case, the defendant was responsible for distribution 51ounces or 1.445 kilograms of phencyclidine (PCP).   the defendant acknowledged accountability for 51 ounces of

Phencyclidine, which quantity represents the total amount involved in his relevant criminal conduct, including amounts he distributed. Additionally, he acknowledged possessing a dangerous weapon in connection with the offenses.

### B. Criminal History Category

The defendant has eleven (11) criminal history points.  The defendant has prior convictions for 1.) Distribution of Cocaine (D.C. 2003), 2.) Possession with Intent to Distribute Heroin (DC 2003), 3.) Distribution of Marijuana (D.C. 2003),[1] 4.) Possession with Intent to Distribute Marijuana (D.C. 2005), 5.) Possession with Intent to Distribute Cocaine (D.C. 2011), 6.) Possession of Marijuana (D.C. 2019), and 7.) Possession of Marijuana (D.C. 2019). This establishes that the defendant has spent the majority of his adult life distributing narcotics.  The defendant also has multiple arrests for drug distribution and other various offenses.

### C. Sentencing Recommendation

The government agreed in the plea agreement to allocute within the non-career offender guidelines, which would be **140 to 175 months** (based on Estimated Offense Level 29 and Criminal History Category V).  The government further agreed to cap its allocution at **151 months'** incarceration.  Under the totality of circumstances, the government believes that a **151-month** sentence of incarceration serves the interests of justice and appropriately balances the sentencing factors under 18 U.S.C. § 3553(a).

The nature of this offense is undoubtedly serious.  The defendant engaged in numerous drug transactions, of large and escalating quantities of illicit narcotics for profit – by his admission in the statement of offense, involving approximately 51 ounces or 1.445 kilograms of

---

1 Offenses 1, 2, and 3 were separate offenses that were all resolved as part of a global plea.

phencyclidine (PCP). During this timeframe, the defendant was also responsible for the distribution of 15.1 grams of fentanyl.   The defendant's offense conduct spanned a lengthy period of time, from September 2022 until his arrest in August 2023.   Furthermore, the evidence of the defendant's drug distribution activities found on the date of his arrest, including two loaded illegal firearms, two white rocks that field tested positive for cocaine, **(Figure 11 above)** and three vials of an unknown liquid, indicate that the defendant was likely still engaged in illegal drug distribution activity at the time of his arrest.

Although the defendant has acknowledged as part of his guilty plea that each count triggers a mandatory minimum offense of 5 years for each count, the government agrees that the defendant is eligible for a three-level downward adjustment for acceptance of responsibility.   Accordingly, the government concurs with the PSR calculation of the total offense level as 29 (PSR ¶ 27) and the sentencing range of 140-175 months (PSR ¶ 69).   However, as part of the defendant's plea agreement, the government agreed not to allocute to a sentence of more than 151 months.   Based on the sentencing factors outlined below.   As outlined below, the government believes that 151 months is the appropriate sentence in this case.

As to the first factor: (1) the nature and circumstances of the offense and the history and characteristics of the defendant, this factor weights in favor of a lengthy period of incarceration. The defendant was caught on video selling phencyclidine (PCP) to undercover officers on numerous occasions.   Phencyclidine (PCP) is a dangerous hallucinogenic drug that can have drastic effects on users.   The psychological effects of PCP include, but are not limited to: disorientation, hallucinations, changes in body awareness, loss of coordination, distorted sensory

perceptions, agitation, and combativeness, amongst other effects.[2]   Additionally, according to the Mount Sinai Medical Center, the effects of taking PCP can range from "numbness throughout your body and loss of coordination" for low doses to "hear[ing] voices that are not there" and engaging in "aggressive and violent" behavior for higher doses.[3]

In Washington, D.C., PCP is commonly consumed by means of a cigarette dipped into a tube of PCP, which is referred to as a "dipper."[4] The defendant's possession of numerous small vials is consistent with this method of distribution, which is particularly dangerous for PCP users:

> There are other dangers to consider in regards to the potency and purity of any dose of PCP. If a cigarette is dipped into a PCP solution, the dose can be highly variable.  Fry, the street name for marijuana or tobacco mixed with phencyclidine, may also be mixed with embalming fluid. This contains formaldehyde, ethanol, and methanol, and it can also cause hallucinations. The fluid is added to enable a cigarette or joint to burn more slowly, possibly leading to a longer high. Consuming embalming fluid can cause damage to body tissues, including the lungs and brain, inflammation, nose and throat sores, and cancer. Concentrations of PCP and its byproducts vary considerably when it is sold on the street, as the drug is difficult to synthesize. Many illicit samples contain PCC, its precursor, which is highly toxic and releases poisonous cyanide. The precursors of PCP can cause more devastating effects than the drug itself.[5]

The defendant was responsible for distributing more than one kilogram of this dangerous hallucinogenic drug within Washington, D.C. over a lengthy period of time.

Additionally, on at least one occasion, the defendant distributed 15.1 grams of fentanyl

---

2  https://americanaddictioncenters.org/pcp-abuse/effects-and-dangers (last visited Mar. 20, 2024).
3  *Substance use – phencyclidine (PCP)*, Mount Sinai,  https://www.mountsinai.org/health-library/special-topic/substance-use-phencyclidine-pcp (last visited Mar. 20, 2024).
4  *Public Vice and Drug Trends: Understanding the Risks and Dangers of Phencyclidine (PCP)*, Metro. Police Dep't (March 2011), *available at* https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/PCP.pdf (last visited Mar. 20, 2024).
5  *Effects and Dangers of PCP Use*, Am. Addiction Ctrs.,https://americanaddictioncenters.org/pcp-abuse/effects-and-dangers (last updated Sept. 9, 2022).

within the District of Columbia.   Fentanyl is an extremely lethal drug.   Two milligrams of

fentanyl can be fatal.   See United States v. Glasgow, 2021 WL 2403136 at *7 (D.D.C.) (Lamberth,

J.).   Conspiring to distribute fentanyl presumptively renders a defendant a serious danger to the

community. See Brown, 538 F. Supp. 3d at 170; cf. also United States v. Bethea, 763 F. Supp. 2d

50, 54 (D.D.C. 2011) (narcotics trafficking generally).

Moreover, at the time of his arrest, the defendant was in possession of two illegal loaded

firearms. The defendant's possession of a loaded handgun was an inherently dangerous act that

placed the community at risk. *See, e.g.*, *United States v. Gassaway*, No. 21-CR-550 (RCL), 2021

WL 4206616, at *3 (D.D.C. Sept. 16, 2021) (collecting cases in this district holding that unlawful

firearm possession is dangerous to the public); *United States v. Howard*, No. 20-MJ-181 (BAH),

2020 WL 5642288, at *2–3 (D.D.C. Sept. 21, 2020) (making same observation); *United States v.

Cole*, 459 F. Supp. 3d 116, 120 (D.D.C. 2020) (noting that a loaded firearm "has the great potential

to escalate into violence"). While this case does not involve the defendant's use of the recovered

firearms, people possess firearms because they intend to use them.

As to the defendant's criminal history, the defendant appears to have primarily made his

living by selling narcotics within the District of Columbia.   This is clearly established by his

extensive criminal history as well as his lack of employment over the years.   In summation, the

defendant has built a career out of dealing dangerous and lethal drugs in the District of Columbia

and has done so while in the possession of illegal firearms.

 As to the second factor, (2) the purposes of the statute; this factor also supports the

governments recommendation.   Phencyclidine is a dangerous drug that has been outlawed and for

which hefty penalties for its distribution exist.   In this case, the defendant in total distributed more

than 1 kilogram of PCP in the District of Columbia. "[t]he statutory language, as well as the legislative history, unequivocally establishes that Congress intended to equate traffic in drugs with a danger to the community." *United States v. Strong*, 775 F.2d 504, 506 (3d Cir. 1985). Its legislative history also "fully supports the conclusion that Congress intended to equate drug trafficking with danger to the community." *Strong*, 775 F.2d at 507; *see also United States v. Alatishe*, 768 F.2d 364, 370 n.13 (D.C. Cir. 1985) (quoting S. Rep. No. 225, 98th Cong., 1st Sess. 20 (1983), U.S. Code Cong. & Admin. News 1984, p. 3203); *United States v. Munchel*, 991 F.3d 1273, 1283 (D.C. Cir. 2021) (recognizing that "threat of dealing drugs" represents a danger to community). "It is well recognized that drug trafficking presents a danger to the community." *United States v. Bell*, 209 F. Supp. 3d 275, 279 (D.D.C. 2016) (Bates, J.) (citing cases).

As to the third factor, (3) the kinds of sentences available, this factor also weighs in favor of the government's request.   A violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(B)(iv) carries a mandatory minimum sentence of 5 years of imprisonment and a maximum sentence of 40 years of imprisonment.   Here, the government's request of 151 months, or 12.5 years, is well within the range of the types and length of sentences available for the defendant's conduct.

As to the fourth factor, (4) the sentencing guidelines, this request also falls within the appropriate guidelines range of 140-175 months.   Here the government did agree to cap its allocution to 151 months, which is already a benefit given to the defendant, despite his dangerous and recidivist conduct.   In terms of the fifth factor (5), the government has already discussed the dangers of PCP, particularly its hallucinatory effects on individuals.   The use of PCP, or the selling of PCP has historically resulted in additional drug violence in Washington, D.C.

Moreover, although there is no evidence that the defendant was armed when selling PCP, law enforcement did recover two firearms when executing a search warrant at his residence. Therefore, due to the dangers of drug trafficking, particularly PCP, a term of 151 months is appropriate in this case. The government does not have sufficient information to address the sixth factor and the seventh factor does not apply here.

The defendant is 41 years old and he has spent the majority of his adult life in and out of jail for distributing narcotics.    He does not appear to be able to maintain stable employment, other than distributing dangerous narcotics in the D.C. area.    Based on the totality of circumstances noted above, as well as additional representations to be made at the sentencing hearing, the government believes a sentence of 151 months incarceration would adequately reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from further crimes of this defendant.    The government understands that the length of this request is not insignificant, however, the defendant has shown that only a lengthy period of incarceration will deter him from distributing dangerous and lethal drugs in the District of Columbia.

### III.     CONCLUSION

For the foregoing reasons, the government recommends that the Court sentence the defendant to 151 months incarceration, to be followed by a term of 4 years of supervised release, and that the Court enter the Consent Order of Forfeiture signed by the parties.   The government submits that 151 months of imprisonment is an appropriate sentence that serves the interests of justice and appropriately balances the sentencing factors under 18 U.S.C. § 3553(a).

Respectfully Submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:     _____/s/_____
ALICIA M. LONG
Assistant United States Attorney
D.C. Bar Number 1659433
United States Attorney's Office
601 D Street, NW
Washington, DC   20530
Telephone: 202-252-6889
Email: alicia.long@usdoj.gov


SHEHZAD AKHTAR
Assistant United States Attorney
D.C. Bar Number 493635
United States Attorney's Office
601 D Street, NW
Washington, DC   20530
Telephone: 202-252-7498
Email: Shehzad.Akhtar@usdoj.gov

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I caused a copy of this pleading to be served upon defense counsel Mary Petras, via the electronic case filing system, this 21st day of March 2024.

_____/s/_____
ALICIA M. LONG
Assistant United States Attorney